**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Telephone: (310) 405-7190
Email: jpafiti@pomlaw.com

*Attorneys for Plaintiff*

*- additional counsel on signature page -*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREI DVORNIC, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>CLOUDERA, INC., THOMAS J. REILLY, JIM FRANKOLA, and MICHAEL A. OLSON,<br><br>Defendants. | Case No.:<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><u>CLASS ACTION</u><br><br>DEMAND FOR JURY TRIAL |

Plaintiff Andrei Dvornic ("Plaintiff"), individually and on behalf of all others similarly situated, by and through Plaintiff's counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, *inter alia*, counsel's investigation, which included review and analysis of: (i) regulatory filings made by Cloudera, Inc. ("Cloudera" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (ii) press releases and media reports issued by and disseminated by the Company; and (iii) analyst reports, media reports, and other publicly disclosed reports and information about the Company.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons and entities who purchased or otherwise acquired Cloudera securities between April 28, 2017 and June 5, 2019, inclusive (the "Class Period"). The claims asserted herein are alleged against Cloudera, the Company's former Chief Executive Officer ("CEO"), Thomas J. Reilly, Chief Financial Officer ("CFO"), Jim Frankola, and Michael A. Olson, the Company's founder and former Chairman, and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder. Throughout the Class Period, defendants failed to disclose adverse facts pertaining to the Company's business, operations, and financial condition, which were known to or recklessly disregarded by defendants. Specifically, defendants failed to disclose that: (i) Cloudera was finding it increasingly difficult to identify large enterprises interested in adopting the Company's Hadoop-based platform; (ii) Cloudera needed to expend an increasing amount of capital on sales and marketing activities to generate new revenues, even as new revenue opportunities were diminishing; and (iii) Cloudera had materially diminished sales opportunities and prospects and could not generate annual positive cash flows. The truth began to be revealed on April 3, 2018 when, in connection with

2

its fourth quarter ("Q4") and full year ("FY") 2018 financial results, the Company provided a disappointing outlook for fiscal 2019 along with missed revenue numbers. This news contradicted defendants' prior positive statements and were all the more surprising as they had come less than a year after Cloudera had gone public. As a result of the defendants' wrongful acts and omissions, and the precipitous decline in the market value of Cloudera's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by SEC, 17 C.F.R. § 240.10b-5. Jurisdiction for this Court is conferred over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

3.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). The acts and transactions giving rise to the violations of law complained of occurred in part in this District, including the dissemination of false and misleading statements into this District. In addition, defendants reside and/or transact business in this District. The Company maintains its corporate headquarters in this District.

4.      In connection with the acts and conduct alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate wire and telephone communications.

## PARTIES

5.      Plaintiff acquired Cloudera securities during the Class Period as described in the Certification attached hereto and incorporated herein by reference and suffered damages as a result of the violations of the federal securities laws alleged herein.

3

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

6.    Defendant Cloudera is a data management and software company incorporated under the laws of Delaware, with its principal executive offices located at 395 Page Mill Road, Palo Alto, California.   The Company's securities trade on the New York Stock Exchange ("NYSE") under the symbol "CLDR."   As of May 31, 2019, there were 274,207,493 shares of the Company's common stock outstanding.

7.    Defendant Thomas J. Reilly ("Reilly") was Cloudera's CEO and a director throughout the Class Period.  He announced his sudden retirement on the last day of the Class Period.

8.    Defendant Jim Frankola ("Frankola") was Cloudera's CFO throughout the Class Period.

9.    Defendant Michael A. Olson ("Olson") founded Cloudera and served as its Chief Strategy Officer ("CSO") and Chairman of its board of directors (the "Board") during the Class Period until January 3, 2019.

10.    Defendants Reilly, Frankola, and Olson are collectively referred to herein as the "Individual Defendants."   During the Class Period, the Individual Defendants ran the Company as hands-on managers overseeing Cloudera's operations and finances and made the materially false and misleading statements described herein.  The Individual Defendants had intimate knowledge about core aspects of Cloudera's financial and business operations.   They were also intimately involved in deciding which disclosures would be made by Cloudera.  Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants, because of their positions with Cloudera, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Each of the Individual

4

Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

## BACKGROUND

11.     Defendant Cloudera is a software company specializing in the provision of data management, machine learning, and advanced analytical tools to businesses.  Its chief product platform is a hybrid open source software, or "HOSS," model which combines the Company's proprietary software with open source technology, most notably the Apache Software Foundation's ("ASF") open-source Hadoop software.  The Company offers a suite of applications through its HOSS platform that allows its customers, generally including large enterprises, to collect, store, organize, and analyze large amounts of data to improve their businesses.

12.     The Company has two primary revenue segments:  (i) subscription; and (ii) services.  Cloudera sells subscriptions to businesses for the use of its platform and products.  The subscriptions are generally for one to three years in length, and Cloudera recognizes subscription revenues ratably over the subscription period.  Servicing revenues are derived from professional services that the Company provides to help companies implement and use their subscriptions.  The great majority of Cloudera's revenues are subscription based.  For example, approximately three-fourths of the Company's total revenues were from subscriptions in fiscal 2017.[1]  The recurring nature of these payments over an extended time frame, and the proportionality of related service revenues, provided the Company and its management with great visibility into current and expected revenue trends.  In addition, a substantial amount of bookings the Company sells during a quarter get billed in the

---

[1] Cloudera's fiscal year ends on January 31 of the calendar year.  For example, Cloudera's fiscal 2017 ended on January 31, 2017.

subsequent quarter, providing Cloudera and its management with even greater insight into existing revenue trends.

13. Defendant Olson co-founded the Company in 2008 and was its CEO until the appointment of Defendant Reilly in 2013, at which point he transitioned to become Cloudera's CSO. In the years since its founding, Cloudera grew to become one of the largest data analytics firms servicing large enterprises in the world. Between its fiscal 2015 and fiscal 2017, the Company's total annual revenues increased approximately 140%, from $109 million to more than $261 million. As of January 31, 2017, the Company also counted among its customers approximately 500 members of the so-called "Global 8000," a list of the largest corporate enterprises globally.

14. It was in this context of great optimism and growth that Cloudera went public in an initial public offering in April 2017 (the "IPO"), selling 17.25 million shares of common stock (including the exercise of the underwriters' overallotment option) at $15.00 per share and raising over $258 million in gross offering proceeds. In the IPO offering documents, and throughout the Class Period, defendants represented that the Company was on the cusp of rapid expansion, as Cloudera grew its customer base, particularly among the Global 8000 and other large organizations, and successfully implemented its "land and expand" business plan to grow revenues from its existing customers.

### DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

### Cloudera Goes Public

15. The Class Period begins on April 28, 2017. On that date, Cloudera filed its prospectus on Form 424B4 for the IPO, which was signed by each of the Individual Defendants (the "IPO Prospectus"). The IPO Prospectus highlighted Cloudera's rapid historical growth and claimed that these trends would continue following the offering. For example, the IPO Prospectus stated that Cloudera's revenues had increased from $166 million in fiscal 2016 to $261 million by fiscal 2017,

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

"representing year-over-year growth in revenue of 57% for our most recent fiscal year." It continued: "*We have experienced rapid growth in recent periods and expect our growth to continue*."[2] The IPO Prospectus represented that the Company's HOSS platform was "the most widely adopted big data platform, with a growing range of applications being built on it."

16. Similarly, the IPO Prospectus claimed that Cloudera "will further expand [its] customer opportunity through the continued growth in use cases and packaged solutions, the expansion of our partner ecosystem and the proliferation of skills, driven by ease of use and accelerating adoption of the cloud." The IPO Prospectus claimed that Cloudera was "only beginning to penetrate [its] market opportunity with Global 8000 companies and public sector entities," and would use the IPO proceeds to fund the Company's "expected growth" following its transition to a public company.

17. The IPO Prospectus stated that the Company's focus on the world's largest businesses gave it a competitive advantage and ample opportunities to continue to grow its business. It stated in pertinent part:

> We market and sell our platform to a broad range of organizations, although we focus our selling efforts on large enterprises, primarily the Global 8000, as well as large public sector organizations. *We target these organizations because they capture and manage the vast majority of the world's data and operate highly complex IT environments, and our enterprise-grade platform has the greatest opportunity to benefit these organizations. Our total number of Global 8000 customers grew from 255 as of January 31, 2015 to 381 as of January 31, 2016, and grew to 495 as of January 31, 2017. For the fiscal years ended January 31, 2015, 2016 and 2017, revenue from our Global 8000 customers represented 61%, 71% and 73% of total revenue, respectively, based on the Global 8000 constituents as of November 1, 2016.* For fiscal 2015, 2016 and 2017, revenue from our public sector, including large public sector, customers represented 11%, 9% and 10% of total revenue, respectively.

18. In particular, the IPO Prospectus highlighted Cloudera's "land and expand" business strategy, which it claimed would "use the initial sale as a foothold to increase revenue per customer by increasing the amount of data and number of use cases each customer runs through our platform."

---

[2] Emphasis added throughout, unless stated otherwise.

Thus, after the initial sale, Cloudera would continue to "work with our customers to identify new use cases that can be developed on or moved to our platform, ultimately increasing the amount of data managed on our platform as well as the number and size of our platform deployments." Similarly, the IPO Prospectus stated that Cloudera was committed to "expand[ing] [its] category leadership in open source data management" and "expanding [its] strategic partnerships and alliances, to acquire new customers and increase penetration among existing customers," with a "business model focuse[d] on maximizing the lifetime value of a customer relationship."

19.    Importantly, the IPO Prospectus represented that upfront investments and associated costs would decrease as more and more customers adopted Cloudera products. For example, it stated that "over time, as [Cloudera's] customer base grows and a relatively higher percentage of [its] subscription revenue is attributable to renewals or greater usage among existing customers relative to new customers, associated sales and marketing expenses and other allocated upfront costs as a percentage of revenue will decrease." This it claimed, in turn, would ultimately allow Cloudera to generate positive cash flows and profits.

20.    Following the IPO, defendants continued to represent that Cloudera's "land and expand" model was working. For example, on June 8, 2017, Cloudera issued a press release announcing its first quarter 2018 ("1Q18") financial results, stating that the Company had achieved total revenues of $79.6 million (a 41% increase) and subscription revenue of $64.7 million (a 59% increase) for the quarter. The Company also reported positive $5 million in cash flow for the quarter due to strong collections.

21.    On the earnings call to discuss the 1Q18 results, Defendant Reilly stated in his prepared remarks: "This quarter we had some great new customer wins while some key existing customers expanded their utilization of our platform through additional use cases."

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

22.    On the same call, Defendant Frankola represented that Cloudera was successfully expanding revenues derived from existing customers.  He stated in pertinent part:

> [W]e benefit from multiple growth vectors. ***As customer data grows revenue grows. As new use cases are deployed revenue grows. And as partners build applications on our platform revenue grows.*** Note that a relatively small portion of revenue relates to professional services and training which are focused on ensuring customer success and driving expanded use of our platform.

23.    Defendant Frankola also highlighted the Company's 142% net expansion rate in 1Q18, and stated that Cloudera still had "plenty of room for growth within the segment" as it had "penetrated only about 6% of the Global 8,000 and have thus far captured just a small portion of our customers' data-related spending."

24.    The next day, Cloudera filed its 1Q18 results on Form 10-Q, which was signed by Defendants Reilly and Frankola.

25.    On September 7, 2017, Cloudera issued a press release announcing its second quarter 2018 ("2Q18")  financial results, stating that the Company had achieved total revenues of $89.8 million (a 39% increase) and subscription revenue of $74 million (a 46% increase) for the quarter.  Defendant Reilly was quoted in the press release as stating:  "In our fiscal second quarter, we outperformed on sales, customer acquisition, customer expansion and cash flow objectives."

26.    On the earnings call to discuss the 2Q18 results, Defendant Reilly stated in his prepared remarks:  "We are reporting a strong second quarter, driven by much of the new product innovation we've recently announced."  He continued:  "In Q2, we executed well as a company, and we continued to benefit from major secular trends in machine learning, cloud and the Internet of Things."

27.    Similarly, Defendant Frankola highlighted the fact that the Company had added "45 net new Global 8000 customers in the quarter" and represented that, "[i]n Q2, many of these customers increased their utilization of the Cloudera platform, fueling growth and driving our net expansion rate to 140% for the quarter."  He later stated:  "We continue to be successful in acquiring and growing

9

large customers, and the benefits of our land-and-expand model are evident in our improving margins and cash flow."

28.     Defendant Frankola also claimed that the Company's plan to decrease spending on new revenues, and ultimately move towards profitability, was working.  He stated in pertinent part:

> Sales and marketing expense was $49.6 million for the second quarter or 55% of total revenue. This compares to 70% of revenue in the year-ago period. This progress is consistent with our expectations. ***The unique dynamics of the Cloudera model, with higher customer acquisition costs offset by much higher customer lifetime value produces improving sales efficiencies as our customers grow.***

29.     In response to an analyst question, Defendant Reilly stated that the Company's salesforce was executing exceptionally well, and that its focus on large customers was working.  He stated in pertinent part:

> ***We continually increase our focus on going after the Global 8000. It's how we have aligned our sales force. It's how we drive our marketing. It's how we work with our partners in identifying industry-specific solutions, and I think that focus has really benefited us in capturing, and is – we've executed very well.*** I think our competitors have made some missteps and that created some opportunities where we gained some more wins. ***But I would take greater pride in just our focus. All of R&D is going after the needs of large enterprises in these hybrid and multi-cloud environments, and that is differentiating us.***

30.     On September 12, 2017, Cloudera filed its 2Q18 results on Form 10-Q, which was signed by Defendants Reilly and Frankola.

31.     On September 15, 2017, Cloudera announced a follow-on stock offering, in which it ultimately sold over 15.4 million common shares at $16.45 per share, for total gross proceeds of $253 million (the "SPO").  The vast majority of shares sold in the SPO were by Company insiders, including more than $9 million worth of shares sold by Defendant Olson.

32.     On December 7, 2017, Cloudera issued a press release announcing its third quarter 2018 ("3Q18")  financial results, stating that the Company had achieved total revenues of $94.6 million (a 41% increase) and subscription revenue of $78.1 million (a 48% increase) for the quarter.  Defendant

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Reilly was quoted in the press release as stating: "We had another strong quarter in Q3, exceeding expectations on financial measures while increasing our competitive advantage in cloud analytics through significant new product innovation." He further claimed that Cloudera was "now at the scale where we can execute on multiple fronts concurrently" and that its "financial model is exhibiting consistent operating leverage as we march toward operating cash flow break-even."

33. On the earnings call to discuss the 3Q18 results, Defendant Olson stated in his prepared remarks that Cloudera was "pleased with [its] growing partnerships with Amazon and Microsoft as they realize Cloudera's platform built on SDX can bring large enterprises with mission-critical applications to their cloud infrastructure."

34. Defendant Reilly followed up by highlighting the Company's purported growth and increasing capture of a dynamic market. He stated in pertinent part:

> The market opportunity is large, and ***the innovation we are delivering is essential to capturing more of it. We're in the early stages of a high-growth market with a rate and pace of change that is staggering. Our team is navigating it well with consistent execution, and we're confident in our strategy. We continue to gain share with the most valuable customers, large enterprises and public sector entities globally. And we're pleased with the operating leverage demonstrated in our business model.*** We remain focused on the long term, and will continue to invest in our partners, the community and in developing differentiated technology.

35. Defendant Frankola, meanwhile, stated that the Company was only "4 to 6 quarters away from estimated cash flow positive."

36. On December 8, 2017, Cloudera filed its 3Q18 results on Form 10-Q, which was signed by Defendants Reilly and Frankola.

37. The statements referenced in ¶¶ 15-30 and 32-36 above were materially false and/or misleading when made because they failed to disclose adverse facts pertaining to the Company's business, operations, and financial condition, which were known to or recklessly disregarded by Defendants as follows:

11

(a)    that Cloudera's Hadoop-based technology had become increasingly dated, and was being surpassed by new cloud-based offerings by the Company's competitors such as Amazon Web Services, Microsoft Azure, and the Google Compute Cloud;

(b)    that Cloudera suffered inherent pricing and servicing disadvantages because its competitors could offer products more fully integrated with their other product offerings that had already been widely adopted by businesses;

(c)    that, as a result of (a) and (b), Cloudera was finding it increasingly difficult to identify large enterprises interested in adopting the Company's Hadoop-based platform;

(d)    that Cloudera's "land and expand" strategy was an unsuccessful ploy to grow revenues in the face of decreasing opportunities to sign up new customers;

(e)    that relatively few of Cloudera's existing customers had a desire or ability to substantially expand their use of the Company's products, and, as a result, the Company's offer of additional applications and up-sale opportunities had been met with limited interest;

(f)    that, as a result of (a)-(e), Cloudera needed to expend an increasing amount of capital on sales and marketing activities to generate new revenues, even as new revenue opportunities were diminishing; and

(g)    that, as a result of (a)-(f), Cloudera had materially diminished sales opportunities and prospects and could not generate annual positive cash flows for the foreseeable future.

38.    In addition, Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii) ("Item 303") required the IPO Prospectus and the SPO Prospectus to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Similarly, Item 503 of SEC Regulation S-K, 17 C.F.R. § 229.503, requires, in the "Risk Factor" section of registration statements

and prospectuses, "a discussion of the most significant factors that make the offering speculative or risky" and requires each risk factor to "adequately describe[] the risk." Defendants' failure to disclose the facts listed in ¶ 37 was a violation of Item 303 because they were known trends and uncertainties that were likely to, and did, have a material unfavorable impact on the Company's revenues and income from continuing operations. This failure also violated 17 C.F.R. § 229.503 because these specific risks were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors that made an investment in Cloudera common stock speculative or risky.

39.     Then, after market on April 3, 2018, Cloudera issued a press release announcing its Q4 and FY 2018 financial results. Cloudera stated that it had achieved total revenues of $103.5 million and subscription revenues of $84.3 million, with a negative operating cash flow of $22 million during the quarter. Most concerning, the Company provided a disappointing outlook for fiscal 2019, with total revenues of only $435 million to $445 million, representing a sharp deceleration in growth. In addition, the Company stated that it expected negative operating cash flows for the year of between $370 million and $375 million and non-GAAP losses of between $0.62 to $0.59 per share. These disappointing figures contradicted defendants' prior positive statements and were all the more surprising as they had come so soon after the SPO and less than a year after Cloudera had gone public.

40.     On the earnings call to discuss the FY 2018 results, defendants revealed that a sharp slowdown in Cloudera's new expansion bookings had occurred in 2018, suggesting that its "land and expand" model was much more limited than advertised. Defendant Reilly also essentially confirmed that Cloudera's customers were not growing their use of the Company's products at a sufficient rate and announced a plan to target "a subset of the Global 8000" in order to "optimize [its] go-to-market efforts for the greatest return," which would "enable [Cloudera] to grow faster and generate cash sooner." In

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

addition, Defendant Reilly announced a substantial reorganization of the Company's salesforce and the appointment of a new head of Global Field Operations.

41.    On this news, the price of Cloudera common stock fell over 40% to $13.29 per share on abnormally high volume of nearly 28 million shares on April 4, 2018.

**Cloudera Merges with Hortonworks**

42.    Because investors did not know the full truth about the Company's increasingly difficult sales and earnings environment the price of Cloudera stock remained artificially inflated.  Moreover, Defendants continued to mislead investors about the true state of Cloudera's business.  For example, on the FY 2018 earnings call, Defendant Reilly stated that "Cloudera is well positioned to continue to grow" and "the changes we've undertaken have strengthened our prospects."  Similarly, when an analyst asked whether the dramatic slowdown in bookings and revenue growth was due to lessening demand for Cloudera's products as rivals increased competition, Defendant Reilly flatly rejected any long-term demand problems.  He responded:  "***So I see nothing that gives me concern about the market . . . . No changes in the competitive landscape nor end market demand.***"  In fact, Defendant Reilly claimed that new product offerings like cloud-based data management were a "***tremendous tailwind***" because Cloudera had "figured out how to win in that market and then stay focused on large enterprises who value our enterprise features."  He even claimed that Cloudera was "better than Amazon on Amazon" because its "products on Amazon are integrated better and operate better than Amazon's own offerings."  On the same call, Defendant Frankola stated that Cloudera was "still confident [it would] get to that cash flow-positive in 2020," indicating a substantial growth in billings with proportionately lower spend in coming quarters.

43.    On April 4, 2018, Cloudera filed its FY 2018 results on Form 10-K, which was signed by the Individual Defendants.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

44.    In the quarters that followed defendants' announcement of FY 2018 results, they continued to represent that Cloudera's new sales and marketing plan and decision to focus on customer expansions was succeeding.  For example, on June 6, 2018, Cloudera issued a press release announcing its first quarter 2019 ("1Q19") financial results, stating that the Company had achieved total revenues of $102.7 million (a 29% increase) and subscription revenue of $85.9 million (a 33% increase) for the quarter.  These figures were in-line with or slightly above the Company's prior guidance.

45.    On the earnings call to discuss the 1Q19 results, Defendant Reilly stated that the Company's previously announced strategic moves had "gone as anticipated" and that the changes would "enhance the company's posture for sustained long-term growth."  Later, in response to an analyst question, Defendant Reilly stated that Cloudera would "compete very effectively" against competition such as Microsoft, Google, and Amazon because "[w]hen we are competing in the cloud, we have so many advantages."

46.    Also, on June 6, 2018, Cloudera filed its 1Q19 results on Form 10-Q, which was signed by Defendants Reilly and Frankola.

47.    On September 5, 2018, Cloudera issued a press release announcing its second quarter 2019 ("2Q19") financial results, stating that the Company had achieved total revenues of $110.3 million (a 23% increase) and subscription revenue of $93.1 million (a 26% increase) for the quarter.  These figures exceeded the Company's prior guidance.  Defendant Reilly was quoted in the release as stating:  "In Q2 we made substantial progress in our product and go-to-market transitions, delivering strong financial results in the quarter and accomplishing many of our goals for sustained success in our market."

48.    On the earnings call to discuss the results, Defendant Reilly reiterated that the Company's new sales strategies and initiatives were working.  He stated in pertinent part:

15

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*[I]n Q2, we made substantial progress in our product and our go-to-market initiatives, delivering strong financial results in the quarter and accomplishing many of our goals for sustained success in our markets. I am pleased with our execution in the quarter and look forward to continued improvement in performance as all of our initiatives are fully implemented.*

It is encouraging to see the changes we are making being validated by customers and partners. In addition, the secular tailwinds in our market remain intact and demand is strong across our solution set.

49.    Defendant Frankola likewise stated:  "We had a strong quarter across the board, especially concerning the key initiatives of our transition plan."  He continued:  "[T]he 128% net expansion rate in Q2 was better than expected due to improved renewal rates and increased focus on customer success. Collectively, these measures best reflect our ability to both acquire target customers and advance customers along the journey towards increasingly attractive unit economics."

50.    Defendant Reilly later echoed these sentiments, stating that in all three major areas of focus for the Company it was "doing extremely, extremely well."  He also claimed that Cloudera was "putting in place [a] channel to allow [it] to address a broader market at a lower acquisition cost and support cost."

51.    On September 6, 2018, Cloudera filed its 2Q19 results on Form 10-Q, which was signed by Defendants Reilly and Frankola.

52.    On October 3, 2018, Cloudera announced that it had entered into a definitive merger agreement with its primary competitor in the Hadoop data analytics space, Hortonworks, Inc. (the "Hortonworks Merger").  In the stock-for-stock deal, valued at $5.2 billion, Hortonworks shareholders would own 40% of the combined Company and receive 1.305 common shares of Cloudera for each share of Hortonworks stock they owned.

53.    In the press release announcing the deal, Defendant Reilly, who became CEO of the combined Company, was quoted as stating that the "businesses are highly complementary and

16

strategic" and would "deliver the industry's first enterprise data cloud from the Edge to AI" and "advance our shared commitment to customer success in their pursuit of digital transformation."

54.    On an investor call to discuss the merger, Defendant Reilly stated that the "primary motivation for this combination is to accelerate innovation" and the "combined company will have substantial scale, resources and talent to do more faster."   He continued:   "Beyond accelerating innovation in cloud technology, the transaction also produces significant financial benefits, including large cost synergies."

55.    Defendant Frankola, meanwhile, stated that the combination would lead to scale and growth on day one.  He also claimed that the merger would lead to significant synergies and lower costs, stating in pertinent part:

The 2 companies together combine for almost [$0.75 billion] of revenue, growing in excess of 30% a year. These are all previously reported numbers presented as of our respective Q2s. We expect to close the merger in calendar Q1 of next year so the pro forma combined will be meaningfully larger. *The important point is that the day the merger closes, we will have significant scale and growth.*

*This combination will unlock powerful synergies. The deal was driven primarily by the strategic merit that Tom and Rob discussed. These benefits will likely generate additional revenue opportunity.* However, we have not built any potential revenue upside into our financial model. Given the strategic fit between the companies, *we are confident that there will be significant opportunities to improve both the efficiency and the effectiveness of our internal operations. We expect these improvements to drive more than $125 million of cost synergies per year* while allowing additional investment in growth areas including IoT, hybrid cloud, data warehousing, machine learning and AI.

*                *                *

As a finance person, this is where I get most excited. *This transition significantly accelerates the path to our long-term model. We expect to continue to grow quickly while generating significant cash flow. Calendar year '19, or fiscal year '20 for Cloudera, will be the year where we integrate the companies and take steps to generate more than $125 million in annual cost synergies.* Calendar year '20 or fiscal year '21 shows what the new company is expected to look like once we have achieved most of the savings. At that time, we expect to be more than $1 billion in revenue, growing at more than 20% per year and generating more than 15% operating cash flow margin.

56.    Even before the Hortonworks Merger was consummated, there were early warning signs that Cloudera was misstating the purported synergies and other benefits it would have on the Company's business, and that the merger was not likely to generate the cost savings or revenue increases Cloudera represented to investors.  For example, on November 8, 2018, after market hours, Hortonworks issued a press release announcing its third quarter 2018 ("3Q18") results, the contents of which sent Cloudera stock into a sharp decline on the following trading day.  Analyst Keith Noonan ("Noonan"), writing for *The Motley Fool* noted that Hortonworks' 3Q18 results directly impacted Cloudera's stock price in an article posted on November 10, 2018, entitled "Why Cloudera, Inc. Stock Fell 22% in October," in which Noonan found that "Cloudera stock ha[d] continued to sell off in November, trading down roughly 7% in the month so far even as the broader market has seen some recovery."  Noonan's explanation for this severely negative trend in Cloudera stock was explicit, stating that "[t]he sell-off appears to be tied to Hortonworks third-quarter release."  As Noonan would later observe in another *Motley Fool* article, published on December 11, 2018, entitled "Why Cloudera Stock Fell 10.3% in November," Hortonworks' 3Q18 results disappointed investors with evidence of slowing growth and by failing to provide guidance for the fourth quarter or full year 2018, which cast negative forebodings on its upcoming merger with Cloudera.  Specifically, the article observed, in relevant part:

Cloudera and Hortonworks expect to close their merger deal early in 2019 and are unlikely to face regulatory barriers, ***so it makes sense that the two companies are being treated as a single entity by the market***. Hortonworks' third-quarter sales and earnings came in ahead of the average analyst estimates, but ***evidence of slowing growth and a lack of guidance for the fourth-quarter guidance appear to have increased negative sentiment on both stocks***.

The cloud company recorded revenue of $87.17 million for the period, up 24% year over year and surpassing the average analyst estimate of $87.07 million. Losses per share for the period arrived at $0.06, well ahead of the average analyst estimate's call for a per-share loss of $0.13. ***However, Hortonworks was up 40% year over year in the previous quarter, and the third quarter of 2017 saw the company record 45% sales growth, so momentum appears to be slipping for the business.***

18

57.     In fact, following Hortonworks' 3Q18 results, its exhibited slowing growth, and Hortonworks' decision not to provide guidance on fourth quarter and full year 2018, Cloudera stock fell $1.36 per share, or 9.61%, to close at $12.79 per share on November 9, 2018, as investors were partially enlightened as to how Cloudera's purported synergies and other benefits of the Hortonworks Merger were materially overstated, and that the merger was not likely to generate the cost savings or revenue increases represented to investors.  However, despite these revelations, Cloudera stock continued to trade at artificially inflated prices throughout the Class Period as Defendants continued to misrepresent the purported benefits of the Hortonworks Merger.

58.     On December 5, 2018, Cloudera issued a press release announcing its third quarter 2019 ("3Q19") financial results, stating that the Company had achieved total revenues of $118.2 million (a 25% increase) and subscription revenue of $99.7 million (a 28% increase) for the quarter.  These figures again exceeded the Company's prior guidance.  Defendant Reilly was quoted in the release as stating:

> *We are pleased with our execution in Q3 and our progress on the strategic combination we have announced with Hortonworks. Pre-closing merger integration planning is going well. And more importantly, we are very encouraged by the reception that our plans are receiving from customers, partners and the developer community*. Together, we will enhance our competitiveness, accelerate our momentum in cloud innovation, and provide a comprehensive solution-set for customers, from the Edge to AI.

59.     On the earnings call to discuss the results, Defendant Reilly stated:  "While much of our focus is on long-term strategy and merger planning, it is reassuring to see continued favorable results from the go-to-market changes we initiated a few quarters ago."  He also once again described the purported benefits of the merger with Hortonworks in his prepared remarks, claiming that Cloudera had "identified the potential for *even greater* synergies than assumed" and stated in pertinent part:

> *The combination of Cloudera and Hortonworks will fuel innovation at a greater rate and pace than we could have achieved as stand-alone companies. The new Cloudera will have the scale, resources and talent to do more and do it faster.* Our significant

19

investments in engineers and committers working with the open-source community will enable us to innovate on key technologies ranging from real-time streaming at the Edge to an enterprise-grade cloud-native data warehouse and a new platform to industrialize AI, all delivering the industry's first enterprise data cloud.

\*     \*     \*

***The combination of Cloudera and Hortonworks creates a clear market leader in industry standard for a modern data platform, producing significant advantages for customers and partners.*** Establishing the industry standard minimizes risk and improves clarity for customers. It simplifies customers' evaluation processes and speeds decision-making. The standard also focuses the open-source communities' innovative efforts.

\*     \*     \*

***Last but certainly not least are the significant financial synergies produced by merging the 2 companies. We expect to generate substantially more cash in a shorter time frame than if we had remained independent companies. We will also accelerate the achievement of our long-term target model. Although the merger will generate large cost savings, it is important to note that we intend to invest some of those savings into enhanced go-to-market capabilities and the technological innovations mentioned previously.***

60.     In response to an analyst question, Defendant Reilly brushed off concerns that Cloudera's platform was becoming outdated, stating:  "***Cloudera is in a very unique competitive position to capture the market growth*** where the market is headed."

61.     Defendant Frankola stated that Cloudera had another good quarter "across the board" and its solid customer metrics "reflect [the Company's] ability to both acquire target customers and advance customers along a journey towards increasingly attractive unit economics."  He also claimed that Cloudera had ***already*** achieved "20% of merger synergies before the deal has closed."  Later, Defendant Frankola stated:  "I mean, from my standpoint, everything that I see gives us confidence . . . everything that we see happening with the merger with Hortonworks, the ability to cross-sell product – I don't need to go through the whole pitch of innovation and cloud and so forth, all of that will be a tailwind for positive growth in net expansion rates."

20

62.    On December 6, 2018, Cloudera filed its 3Q19 results on Form 10-Q, which was signed by Defendants Reilly and Frankola.

63.    The statements referenced in ¶¶ 42-51, 53-55, and 58-62 above were materially false and/or misleading when made because they failed to disclose adverse facts pertaining to the Company's business, operations and financial condition, which were known to or recklessly disregarded by Defendants as follows:

(a)    that Cloudera's Hadoop-based technology had become increasingly dated, and was being surpassed by new cloud-based offerings by the Company's competitors such as Amazon Web Services, Microsoft Azure, and the Google Compute Cloud, and that such adverse competitive trends had accelerated;

(b)    that Cloudera suffered inherent pricing and servicing disadvantages because its competitors could offer products more fully integrated with their other product offerings that had already been widely adopted by businesses;

(c)    that, as a result of (a)-(b), Cloudera was finding it increasingly difficult to identify large enterprises interested in adopting the Company's Hadoop-based platform;

(d)    that Cloudera's "land and expand" strategy was an unsuccessful ploy to grow revenues in the face of decreasing opportunities to sign up new customers;

(e)    that relatively few of Cloudera's existing customers had a desire or ability to substantially expand their use of the Company's products, and, as a result, the Company's offer of additional applications and up-sale opportunities had been met with limited interest;

(f)    that, as a result of (a)-(e), Cloudera needed to expend an increasing amount of capital on sales and marketing activities to generate new revenues, even as new revenue opportunities were diminishing;

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(g)    that, as a result of (a)-(f), Cloudera had materially diminished sales opportunities and prospects and could not generate annual positive cash flows for the foreseeable future;

(h)    that the primary motivation for the Hortonworks Merger was to generate growth through the acquisition of existing customers of Hortonworks, because defendants realized that generating organic sales growth for the Company's increasingly dated product offerings was becoming exceedingly difficult; and

(i)    that the purported synergies and other benefits of the Hortonworks Merger had been materially overstated, as the merger was not generating, nor was it likely to generate, the cost savings or revenue increases represented to investors.

64.    In addition, Item 303 required the 2018 Form 10-K to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Similarly, Item 503 of SEC Regulation S-K, 17 C.F.R. § 229.503, requires, in the "Risk Factor" section of registration statements and prospectuses, "a discussion of the most significant factors that make the offering speculative or risky" and requires each risk factor to "adequately describe[] the risk."  Defendants' failure to disclose the facts listed in ¶ 61 was a violation of Item 303 because they were known trends and uncertainties that were likely to, and did, have a material unfavorable impact on the Company's revenues and income from continuing operations.  This failure also violated 17 C.F.R. § 229.503, because these specific risks were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors that made an investment in Cloudera common stock speculative or risky.

65.    On January 3, 2019, Cloudera announced the close of the Hortonworks Merger.

66.    Then, after market on March 13, 2019, Cloudera issued a press release announcing its Q4 and FY 2019 financial results.  Cloudera stated that it had achieved total revenues of $144.5 million and subscription revenue of $123 million.  However, the Company provided weak guidance for first quarter 2020 ("1Q20"), the first fiscal quarter after the completion of the Hortonworks Merger.  The Company stated that it expected 1Q20 total revenues of only between $187 million and $190 million and subscription revenues of between $154 million and $156 million, while it expected FY 2020 total revenues of only between $835 million and $855 million and subscription revenues of between $695 million and $705 million.  In addition, the Company stated that it expected negative operation cash flow of $30 million to $40 million for the year.

67.    On the earnings call to discuss the FY 2019 results, Defendant Frankola revealed that the merged entity would need to take a $62 million "haircut" because of purchase price accounting adjustments and also a $28 million write-down of deferred commission expenses.  In addition, he stated that differences in billing periods between the companies would reduce 2020 cash flows by $125 million as the legacy companies reconciled their billing cycles.

68.    On this news, the price of Cloudera common stock fell nearly 20% to close at $11.71 per share on abnormally high volume of nearly 38 million shares on March 14, 2019.

69.    However, because investors did not know the full truth about the Company's increasingly difficult sales and earnings environment and the Hortonworks Merger, the price of Cloudera securities remained artificially inflated.  Indeed, defendants dismissed the disappointing guidance as not related to the fundamentals of the Company and claimed that Cloudera was successfully outcompeting its rivals.  For example, on the FY 2019 earnings call, Defendant Frankola stated that Cloudera still "anticipate[d] significant improvements in R&D, sales and marketing and G&A expense ratios as [the Company] complete[d] [its] merger synergy actions."  Similarly, Defendant

Reilly stated: "Merger integration is going well and ahead of schedule." In response to an analyst question, he also dismissed competitive concerns from other providers such as Amazon, stating "we feel very strong that market is moving in our direction around the hybrid multi-cloud, and then our functionality is best-in-class."

70. Then, after market on June 5, 2019, Cloudera issued a press release announcing disappointing 1Q20 results. The Company stated that its first quarter revenues were $187.5 million, but that several customers had elected to "postpone renewal and expansion" of their subscription agreements. The Company also announced that its losses from operations had ballooned to $103.8 million, roughly *double* the year-over-year period. In addition, Cloudera revealed that its highest spending customers were essentially flat for the quarter, that middle-spend customers had declined sequentially, and that it was suffering an elevated dollar churn rate of 15%. In other words, the Company was effectively losing business, notwithstanding its recent merger with Hortonworks, its vaunted "land and expand" strategy, and the fact that the Company had spent a staggering $119 million on sales and marketing during the quarter. The Company also slashed its full-year outlook, reducing total revenue guidance by $90 million and stating it expected recurring revenue growth of only 0% to 10% for the year (compared to 18% to 21% in the prior issued guidance), and that it now expected to suffer a negative cash flow from operations of between $75 million and $95 million for the year, more than double the amount stated in the previously issued guidance. The same day, Cloudera announced that its CEO, Defendant Reilly, would be abruptly retiring from the Company.

71. Analysts questioned the reason for the abrupt slowdown, pointing to increased competition, especially by large cloud providers such as Google, Microsoft, and Amazon. On the earnings call to discuss the results, one analyst wondered whether customers were "simply migrating to

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

a different form of data architecture" and abandoning the Company's Hadoop-based platform as obsolete.

72.    Analyst reaction was also swift and severe.    For example, Needham downgraded Cloudera stock from "Strong Buy" to "Hold," calling the 1Q20 results a "thesis changer."  Similarly, an analyst report by Stifel described Cloudera's shocking cut to guidance as "*one of the deepest cuts we can remember in the software space since the dot.com meltdown*."

73.    On this news, the price of Cloudera common stock fell over *40%* to just $5.21 per share on abnormally high volume of over 57 million shares on June 6, 2019.

74.    As a result of defendants' wrongful acts and omissions, Plaintiff and the Class purchased Cloudera securities at artificially inflated prices and suffered significant losses and were damaged thereby.

## NO SAFE HARBOR

75.    Defendants' "Safe Harbor" warnings accompanying Cloudera's reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  Because most of the false and misleading statements related to existing facts or conditions, the Safe Harbor has no applicability.  To the extent that known trends should have been included in the Company's financial reports prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), they are excluded from the protection of the statutory Safe Harbor. 15 U.S.C. § 78u-5(b)(2)(A).

76.    The defendants are also liable for any false or misleading FLS pleaded herein because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer and/or director of Cloudera who knew that the FLS was false.  In addition, the FLS were contradicted by existing, undisclosed material facts that were required to be disclosed so that the FLS would not be misleading.  Finally, most of the purported "Safe

25

Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide any meaningful disclosures of the relevant risks.

## ADDITIONAL SCIENTER ALLEGATIONS

77.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents and actions intended to manipulate the market price of Cloudera securities as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Cloudera, their control over, and/or receipt or modification of Cloudera's allegedly materially misleading misstatements and/or their associations with the Company, which made them privy to confidential proprietary information concerning Cloudera, participated in the fraudulent scheme alleged herein.

78.    The adverse developments at issue also impacted the Company's most important revenue streams and derived from the Company's most important business relationships.  Subscription and service revenues were overseen by the Individual Defendants as the Company's top executives during the Class Period and, further, their involvement included hands-on oversight.  The Individual Defendants repeatedly held themselves out to investors as the employees most knowledgeable on these topics.  As such, the Individual Defendants knew or were reckless in not knowing of the undisclosed facts detailed herein.

79.    Defendants also had the motive and opportunity to commit fraud.  Company insiders sold tens of millions of dollars in stock in the SPO, including over $9 million worth of stock sold by Defendant Olson.  Similarly, Cloudera used its artificially inflated securities price to complete the Hortonworks Merger.

## LOSS CAUSATION

80.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Cloudera securities and operated as a fraud or deceit on purchasers of Cloudera securities.  As detailed above, when the truth about Cloudera's misconduct was revealed over time, the value of the Company's securities declined precipitously as the prior artificial inflation no longer propped up Cloudera securities' prices.  The declines in the price of Cloudera shares were the direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the share price declines negate any inference that the losses suffered by Plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company specific facts unrelated to the defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiff and other Class members, was a direct result of defendants' fraudulent scheme to artificially inflate the prices of the Company's securities and the subsequent significant decline in the value of the Company's securities when defendants' prior misrepresentations and other fraudulent conduct were revealed.

81.     At all relevant times, defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiff and other Class members.  Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Cloudera's business, operations, and financial condition, as alleged herein.  Throughout the Class Period, defendants issued materially false and misleading statements and omitted material facts necessary to make defendants' statements not false or misleading, causing the prices of Cloudera's securities to be artificially inflated.  Plaintiff and other Class members purchased Cloudera securities at those artificially inflated prices, causing them to suffer damages as complained of herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

82.    At all relevant times, the market for Cloudera securities was an efficient market for the following reasons, among others:

(a)    Cloudera securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    according to the Company's Form 10-Q, filed on June 5, 2019, the Company had over 274 million common shares outstanding as of May 31, 2019, demonstrating a very active and broad market for Cloudera securities;

(c)    as a regulated issuer, Cloudera filed periodic public reports with the SEC;

(d)    Cloudera regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services, the Internet, and other wide-ranging public disclosures; and

(e)    unexpected material news about Cloudera was rapidly reflected in and incorporated into the Company's share price during the Class Period.

83.    As a result of the foregoing, the market for Cloudera securities promptly digested current information regarding Cloudera from publicly available sources and reflected such information in Cloudera's share price.  Under these circumstances, all purchasers of Cloudera securities during the Class Period suffered similar injury through their purchase of Cloudera securities at artificially inflated prices, and a presumption of reliance applies.

84.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). Here, the Class' claims are also grounded on defendants' failure to disclose material adverse information regarding the Company's obsolete products and deteriorating marketing, business, and

28

customer base, as well as the true costs of the Hortonworks Merger, information that the defendants should have disclosed and proof that positive reliance is not a prerequisite to recovery. Instead, the withheld facts must be material in the sense that a reasonable investor may have considered them important in making investment decisions. Based on the alleged omissions herein, this requirement is satisfied here.

## CLASS ACTION ALLEGATIONS

85.     This is a class action on behalf of all persons and entities who purchased or otherwise acquired of Cloudera securities during the Class Period who were damaged thereby (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

86.     Common questions of law and fact predominate and include: (i) whether defendants violated the Exchange Act; (ii) whether defendants omitted and/or misrepresented material facts; (iii) whether defendants knew or recklessly disregarded that their statements and/or omissions were false; (iv) whether the price of Cloudera securities were artificially inflated during the Class Period; (v) whether defendants' conduct caused the members of the Class to sustain damages; and (vi) the extent of and appropriate measure of damages.

87.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Cloudera securities were actively traded on the NYSE. Upon information and belief, these shares are held by hundreds or thousands of individuals located geographically throughout the country.

88.     Plaintiff's claims are typical of those of the Class. Prosecution of individual actions would create a risk of inconsistent adjudications. Plaintiff will adequately protect the interests of the

Class. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants**

89.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

90.     During the Class Period, defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

91.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they, directly and indirectly, by the use of the means or instrumentality of interstate commerce, or the mails or facility of a national securities exchange:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Cloudera securities during the Class Period.

92.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Cloudera securities. Plaintiff and the Class would not

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

have purchased Cloudera securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

93.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

94.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Cloudera securities during the Class Period.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

95.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

96.    During the Class Period, the Individual Defendants acted as controlling persons of Cloudera within the meaning of Section 20(a) of the Exchange Act.  By virtue of their share ownership, executive and Board positions and stock ownership, and their culpable participation, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends were false and misleading as detailed herein.

97.    The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.  In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore,

are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

98.    By reason of such wrongful conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

99.    As a direct and proximate result of these defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  July 26, 2019

Respectfully submitted,

POMERANTZ LLP

By: */s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)

32

1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

POMERANTZ, LLP
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com

POMERANTZ LLP
Patrick V. Dahlstrom
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS